ECKER *v.* ECKER.

1. GIFTS—CANCELLATION OF INSTRUMENTS—MENTAL INCOMPETENCY —WEIGHT OF EVIDENCE.

In a suit by a grandson to set aside deeds and assignments of mortgages by a father and mother to a son, mental incompetency of the donors, *held,* not established by the weight of the evidence.

2. SAME — FIDUCIAL RELATIONS — UNDUE INFLUENCE — FRAUD — DURESS—WEIGHT OF EVIDENCE.

Although there was opportunity to exercise undue influence, and the relations of the parties were fiducial, the claims of undue influence, fraud, and duress, *held,* not sustained by the record; the circumstances upon which they are predicated being more consistent with innocence than with guilt.

3. SUBROGATION—ACCOUNTING—EXECUTORS AND ADMINISTRATORS.

In a suit for an accounting against a son individually and as administrator of his father's estate, where defendant, who had been in business with the father, paid debts against the latter and the firm, he should be subrogated to the rights of the creditors whose claims were paid, on settlement of the father's estate in probate court.

Appeal from Montcalm; Davis (Frank D. M.), J. Submitted October 27, 1921. (Docket No. 120.) Decided December 21, 1921.

Bill by A. Jay Ecker against Roy C. Ecker and others to set aside certain deeds and assignments of mortgages, and for an accounting. From a decree for plaintiff, defendants appeal. Reversed, and bill dismissed.

*Hawley & Eldred,* for plaintiff.

*E. J. Bowman,* for defendants.

Clark, J. The bill of complaint alleges that in 1915, principally in August and December, 1915, by means of fraud, duress and undue influence and while Ambrose J. Ecker and Rhoda A. Ecker, his wife, were mentally incompetent, their son Roy C. Ecker and Mabel Ecker, his wife, defendants, procured from them by assignment a number of mortgages, and by deed several parcels of land, and by gift considerable personal property. The bill prays that the assignments and deeds may be set aside and that an accounting be had. The decree found the material allegations of the bill to be true, set aside the deeds and assignments and referred the accounting to a circuit court commissioner for report. The said defendants and defendant Roy C. Ecker, as administrator of his father's estate, have appealed.

Ambrose J. Ecker for many years and to the day of his death, May 24, 1916, when he was 82 years of age, was engaged at Greenville in the real estate, loan and insurance business. He attended at his office almost daily to the day of his death. He died suddenly upon the street. Rhoda A. Ecker died in the fall of 1916. Roy C. Ecker was the only living child of his parents. At their request he returned from Chicago about 1906 to assist his father in business. On several occasions thereafter the mother expressed pleasure because of her son's return and his assistance of the father and stated to a life-long friend:

"You know, if Roy makes good and carries on the business everything will be his."

A careful reading of the record justifies the statement that the association and relation of this father and son were marked to an unusual degree by mutual affection, confidence and esteem.

The plaintiff, A. Jay Ecker, 31 years of age, is a grandson, son of Frank Ecker, deceased, who, after his

marriage and after the birth of his only child, the plaintiff, deserted his family and never returned to them. He died in April, 1916. His parents frequently stated that they would leave nothing from the estate to Frank. They often assisted plaintiff and his mother by gifts of money, clothing, etc. Several years after the desertion, plaintiff's mother, living at Grand Rapids, obtained a divorce and married one Cook. Later they moved to Cleveland, where plaintiff now resides with his wife and owns and conducts a small store business. Plaintiff and his mother maintained friendly relations with the other members of the Ecker family and made occasional visits to the parental home. Plaintiff's mother testified to statements by the parents that her son was to have Frank's share of the estate.

When Roy C. Ecker first became associated with his father in the business, he was to have a monthly allowance of $25. This amount was increased from time to time during subsequent years, but during all the period and up to January 29, 1916, his withdrawals exceeded the allowance. The overdrafts were carried on the books, and on at least two occasions during the period they were in part charged off by the father, and at times the father gave the son credit as against such overdrafts for "sundries work," "pruning orchard," etc., and on January 27, 1916, the overdrafts were represented by two notes amounting to $2,128.52, as to which there appears on the books of A. J. Ecker & Son the following in the handwriting of the father:

"Jan. 29th, R. C. Ecker                    Cr.
   By work on orchard and extra work
      previously to balance notes          $2,128.52."

On February 17, 1915, Ambrose J. Ecker assigned 2 real estate mortgages to Mabel Ecker, and on August 12, 1915, he assigned 10 such mortgages to Roy C. Ecker. On December 6, 1915, Ambrose J. Ecker and

Rhoda A. Ecker as his wife and in her own right made, executed and delivered 7 deeds conveying to Roy C. Ecker and Mabel E. Ecker all their real estate.

After the father's death Roy C. Ecker also took possession of an automobile, office furniture, household furniture, and it seems certain funds of Ecker & Son, although the record is not clear upon that question. He also sold for $1,200 the insurance business. It also appears that Ecker & Son, if not the father alone, had debts to a considerable amount at the time of the father's death. Part at least of these have been paid by Roy C. Ecker, perhaps all for the record does not indicate complaint from the creditors. The final account of the defendant administrator showed receipts of $1,010.75, the avails of an insurance policy. The account was allowed in the probate court but the administrator has not been discharged.

On June 20, 1916, following the death of his father, Roy C. Ecker in a letter to plaintiff stated that the father had told him to pay plaintiff $2,000, less sums advanced, and plaintiff's mother $1,000, and he admitted in writing obligation accordingly and not otherwise. Mrs. Cook, plaintiff's mother, was paid the amount due her. The amounts received by plaintiff, which defendants say were advances, are: December 9, 1915, $330; April, 1916, $15; June, 1916, $50; July, 1916, $1,000; December, 1916, $200; a total of $1,595. Defendants have been ready and willing to pay the remaining $405.

Plaintiff's claim of mental incompetency of his grandparents is supported principally by the testimony of his mother, Mrs. Cook, of her observations at the times of her occasional visits. Some of such visits were during the time in question, and the substance of such testimony is that the old people were ill and feeble, showing marked loss of the powers of memory, perception, conception and concentration, mentally in-

competent with respect to the matters here involved. A sister of Mrs. Rhoda A. Ecker testified that Mr. Ecker was not a strong man in his late years, was forgetful, but that he was out most every day and did business up to the last. Of Mrs. Ecker, she also testified of failing health during the last year and of an instance, perhaps after or about the time of the signing of the deeds, when Mrs. Ecker was "clear off." Another sister of Mrs. Ecker gave testimony as to Mr. Ecker's being forgetful, feeble mentally and physically, and of Mrs. Ecker's being ill and disturbed mentally during the fall of 1915.

The defendants had testimony from many witnesses, including two other sisters of Mrs. Ecker, several immediate neighbors, friends of a life time, a lawyer who had known Mr. Ecker 25 years personally and as a client, a brother-in-law who had known them 50 years, others who had known them for periods of 20, 25, 30 and 45 years, 3 bankers with whom Mr. Ecker had done business, a physician who had attended Mrs. Ecker, and the notary who took the acknowledgments of the deeds. Some of these witnesses had seen the old people daily during the time in question, some oftener, some less frequently. Some were close friends of Mrs. Ecker, others were friends and business acquaintances of Mr. Ecker. Their evidence sustaining the mental competency and soundness of these old people during the time in question is convincing. The weight of the evidence is against plaintiff's contention upon this question. And there is testimony of Mr. Ecker's having said he wanted to dispose of his property so that there would be no administration of it. Of statements made respecting the property, we quote from the brief of counsel:

"It appears by the record that Ambrose J. Ecker told Bert Moore two or three times that the 'fruit farm,' socalled, would be Roy's some day, and the spring he

died, told him that the farm was Roy's, and also told him the home where he (Ambrose J. Ecker) lived and the Six Lakes farm would be Roy's some day, and told Joseph Kimmel that when he got through, the Six Lakes farm was to be Roy's, that it was not for sale. Mrs. Rhoda A. Ecker told her sister, Mrs. Middleton and Mrs. Bessie Knight, a neighbor, that Roy and Mabel were to have the house where they lived.    The record shows that the Greenville Independent (a newspaper published at Greenville, Michigan) of December 15, 1915, contained an item showing the recording of a deed from Ambrose J. Ecker and wife, to Roy C. Ecker and wife, that soon thereafter a sister, Mrs. Alice Pulhemus, asked Mrs. Rhoda A. Ecker about the deed, and was told they had deeded the farm to Roy, they wanted him to have it, because he had done so much on it and Mrs. Henry, another sister, that they had deeded a number of things to Roy, that on the day of the funeral of Ambrose J. Ecker, Mrs. Rhoda A. Ecker, his widow, told Roy M. Watkins in the presence of his wife and Mrs. Henry, a sister of Mrs. Rhoda A. Ecker,

" 'That the good Lord had granted her wish to outlive father, that she was so fearful that she would be taken first, but that now that worry was forever off her mind * * * and you know there will be no probate proceedings necessary, as everything is fixed just as we wanted, and I feel that I have no burden of care or worry of the property on me.' "

Space forbids a discussion of the claim of undue influence, fraud and duress.    Granting that there was opportunity to exercise undue influence and that the relations of the parties were fiducial, the claim is not sustained by the record.    It is predicated upon circumstances which we think are more consistent with innocence than with guilt.    The said deeds and assignments of mortgages and the entry of satisfaction by the father of the said notes and overdrafts of the son are valid and as to them the bill of complaint should be dismissed.

The record does not establish a gift or transfer of the other property of Ambrose J. Ecker to which the

accounting should be confined.  The accounting and administration of said property should be in said probate court.  Upon such accounting the defendants should be subrogated to the rights of any creditor or creditors of Ambrose J. Ecker individually and as a partner in Ecker & Son, whose claim or claims have been paid in whole or in part by defendants or either of them.  The decree will be without prejudice to plaintiff's right to the remainder of the $2,000, the sum of $405 admittedly due him.

The decree is reversed.  Decree will be entered dismissing the bill of complaint, with costs to defendants.

STEERE, C. J., and MOORE, WIEST, FELLOWS, STONE, BIRD, and SHARPE, JJ., concurred.